**John DOE 1631, Appellant,**

v.

**QUEST DIAGNOSTICS, INC., and Quest Diagnostics Clinical Laboratories, Inc., d/b/a Quest Diagnostic, Respondents,**

and

**LabOne, Inc., Defendant.**

**No. SC 92790.**

Supreme Court of Missouri,
En Banc.

March 19, 2013.

Rehearing Denied April 30, 2013.

Kenneth M. Chackes, Bridget L. Halquist, Chackes, Carlson & Halquist LLP, St. Louis, for Doe.

Kenneth W. Bean, Teresa Bartosiak, Sandberg Phoenix & von Gontard PC, St. Louis, for Quest.

LAURA DENVIR STITH, Judge.

John Doe appeals the trial court's judgment in favor of Quest Diagnostics Clinical Laboratories, Inc. (Quest Laboratories) on Mr. Doe's claim for wrongful disclosure of his Human Immunodeficiency Virus (HIV) test results in violation of Missouri statutory requirements. He argues that the trial

court should not have submitted an affirmative defense instruction requiring the jury to find for Quest Laboratories if it found that Mr. Doe gave Quest Laboratories "written authorization" to disclose his HIV test results, as there was no substantial evidence that he provided any such "written authorization."

This Court agrees and reverses the judgment in favor of Quest Laboratories on this count. A jury instruction must be supported by substantial evidence. Section 191.656.2(1)(c)[1] requires a written authorization for disclosure by the subject of the test. Here there was no evidence that Mr. Doe provided such a written authorization. The trial court committed prejudicial error in submitting the question whether Mr. Doe's action in handing a form to the laboratory on which a doctor's assistant had written a facsimile number in a box entitled *Ordering Physician and/or Payors* should be considered a written authorization by Mr. Doe.

Mr. Doe also appeals the judgment against him on his claim that Quest breached a fiduciary duty to him in disclosing the test results because the instruction wrongly, he contends, required the jury to find that Quest Laboratories was negligent. No Missouri case or case in other jurisdictions has been cited that has recognized such a relationship between laboratory and patient. This Court need not reach the issue whether it would recognize such a relationship if the necessary proof of trust and confidence were shown and if there were no other available remedy for a breach of confidentiality. Here, section 191.656 already imposes a duty of confidentiality and creates a remedy for its breach. Where an adequate remedy at law already exists under Missouri statute, this Court will not create a new equitable remedy as requested by Mr. Doe.

This Court also affirms the trial court's grant of a directed verdict to Quest Laboratories' parent, Quest Diagnostics, Inc. (Quest Diagnostics). Mr. Doe failed to show that it was directly liable for the alleged tortious conduct or that the corporate veil should be pierced so that it could be held liable for the torts of its subsidiary, Quest Laboratories.[2] Finally, this Court rejects Quest's argument that Mr. Doe's claims should never have been submitted to the jury because he did not file an affidavit of merit pursuant to section 538.225, RSMo. The purpose of the affidavit requirement of section 538.225 is to avoid ungrounded medical malpractice claims. Mr. Doe's claim is not one of medical malpractice but breach of a statutorily imposed duty of confidentiality.

The judgment is reversed in part, and the case is remanded.

## I. FACTUAL AND PROCEDURAL BACKGROUND

John Doe has been living with HIV since about 1999. In order to determine whether Mr. Doe's medication regime is successfully suppressing the virus, his physician, Matthew German, M.D., has routinely ordered certain laboratory tests to be performed on his blood. On July 24, 2006, Dr. German completed a "requisition" form, directing Quest to perform two such tests on Mr. Doe's blood. The requisition form is a written order to the laboratory setting out what tests are to be performed as well as to whom, how and where the results are

---

1. All references to section 191.656 are to RSMo Supp.2012.

2. For purposes of clarity and brevity, Quest Diagnostics Clinical Laboratories, Inc. and Quest Diagnostics Inc. will be collectively referred to as "Quest" where the distinction between the two is not material.

to be reported. Dr. German and his medical assistant, Faith Mustone, completed the form and gave it to Mr. Doe to take to Quest, but Mr. Doe accidentally left the form in Dr. German's office. When he realized he had forgotten the form, Mr. Doe telephoned Ms. Mustone. She said he could come back and get a new requisition form or she could fax one to him at the Wayman A.M.E. Church, where Mr. Doe worked as a personal assistant to the pastor. Mr. Doe requested that the form be faxed, and he gave her the number "3xx-xxx8."

In the upper, left-hand quadrant of the requisition form was a two-inch-by-four-inch box titled *"Ordering Physician and/or Payors."* The box contained the names of three physicians and had a checkmark next to Dr. German's name, meaning that Dr. German was the ordering physician. The remainder of the box was empty white space. Dr. German and Ms. Mustone would sometimes use the empty space to order tests that were not listed or to provide the laboratory with billing information for insurance providers. It was in this box on Mr. Doe's requisition form that Ms. Mustone wrote "Faxed to 3xx-xxx8" to indicate that she had sent the form by fax to the number provided by Mr. Doe. Mr. Doe received the faxed form at the church and took it with him to the Quest office in the Central West End of the City of St. Louis to have the blood work done.

A Quest patient services supervisor testified that when a patient comes into Quest for testing, a phlebotomist enters the information from the requisition form into a computer system. The phlebotomist then prints out a computerized requisition form, which contains the entered information. Mary Petty was the phlebotomist who entered Mr. Doe's information and drew his blood. Ms. Petty later testified that she interpreted the notation made by Ms. Mustone on the original requisition form, "Faxed to 3xx-xxx8," as a directive to fax Mr. Doe's test results to the number indicated. She thought this even though on Mr. Doe's requisition form there was a box labeled "Fax results to," and that box was blank, containing neither a number nor a signature. Ms. Petty testified that she nonetheless thought the form directed her where to fax the test results because she had noticed that doctors commonly ignored the box provided for fax numbers and instead wrote their sending directives in the larger, blank space above—the location where Ms. Mustone wrote the church fax number. She also said that doctors use a variety of terms to indicate a fax request, including "FAX," "FX," "FA," "F" and "Faxed."

For these reasons, although she did not have a signed authorization from Mr. Doe to send his test results to anyone other than him or his doctor, Ms. Petty said she had no basis to question that Mr. Doe's results were to be sent to the number written in the blank space of his requisition form and entered "FAX 3xx-xxx8" into the Quest computer system, and this number then appeared on the computerized requisition form. At no point did Ms. Petty discuss the "Faxed to" notation with Mr. Doe, Dr. German or Ms. Mustone to clarify its meaning, nor did she say she believed that the patient had placed the "faxed to" notation in the blank space in the top box.

After a patient's blood is drawn, the phlebotomist writes the patient's name on the sample, initializes the computerized requisition form, and sends the computerized form, original requisition form and sample to the main laboratory for testing. The day after Mr. Doe's blood draw, he went on vacation. In the meantime, Quest generated the test results and faxed to Dr.

German and to 3xx-xxx8 a two-page report along with a cover letter indicating that the fax contained confidential medical information. Dr. German indicated that it would be difficult for someone without medical knowledge to interpret the results, but the report clearly contains three references to HIV. The facsimile machine was located in an open area, and many church members and employees could access both the machine and Mr. Doe's inbox. By the time Mr. Doe returned from his vacation, the report had been removed from the church facsimile machine and placed in his in-box.

Mr. Doe testified that after Quest sent the fax to the church he received two or three hateful anonymous telephone calls at his home and another three or four at the church. Mr. Doe recounted one caller telling him he was "an HIV riddled fagot and [his] bitch ass was to stay away from the kids." Approximately six months after Quest sent the fax to the church, Mr. Doe was terminated from his position as personal assistant to the pastor. The pastor already knew about Mr. Doe's HIV status prior to the facsimile incident, and he told Mr. Doe that the termination decision was made for financial reasons.

Mr. Doe subsequently filed suit against Quest Diagnostics, Quest Laboratories and LabOne, Inc., alleging wrongful disclosure of HIV test results in violation of section 191.656, RSMo, and breach of fiduciary duty. Mr. Doe later voluntarily dismissed LabOne, Inc., as a defendant.

The case proceeded to trial. At the close of the evidence, the court entered a directed verdict in favor of Quest Diagnostics on the ground that it was a separate corporation from Quest Laboratories and did not exercise such control over the latter that the corporate veil should be pierced. The court submitted two theories—violation of section 191.656 and breach of fiduciary duty. During deliberations, the jury sent a note to the judge asking "Does the decision on the [the affirmative defense], hinge on our decision on [the verdict director], about whether the plaintiff has given written authorization?" The court declined to provide further direction, telling the jury that it "must be guided by the evidence as [they] remember it and the Court's instructions."

The jury found in favor of Quest Laboratories on both counts, and the trial court entered judgment on that verdict. Mr. Doe appealed. After opinion by the court of appeals, this Court granted transfer pursuant to Mo. Const. art. V, sec. 10.

## II. JURY INSTRUCTIONS

### A. Standard of Review

Whether a jury was instructed properly is a question of law that this Court reviews *de novo*. *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 767 (Mo. banc 2010). If a jury instruction does not follow an applicable Missouri Approved Instruction (MAI), "[s]uch errors are presumed to prejudice the defendant unless it is clearly established . . . that the error did not result in prejudice." *State v. Westfall*, 75 S.W.3d 278, 284 (Mo. banc 2002). Where there is no applicable MAI, the instruction will be reviewed to determine "whether the jury [could] understand the instruction and whether the instruction follows applicable substantive law by submitting the ultimate facts required to sustain a verdict." *First Bank v. Fischer & Frichtel, Inc.*, 364 S.W.3d 216, 219 (Mo. banc 2012). "If this Court finds that the instruction is erroneous, it must then determine whether the error misdirected, misled or confused the jury, resulting in prejudicial error and justifying the grant of a new trial." *Id.*

## B. Submission of Jury Instruction Number 9 Caused Prejudicial Error

■ Instruction No. 9 submitted an affirmative defense to Mr. Doe's claim of wrongful disclosure of HIV test results under section 191.656. It directed the jury to issue a verdict in favor of Quest if it found that Mr. Doe provided Quest with written authorization to send his test results to 3xx-xxx8.[3] Mr. Doe argues that Instruction No. 9 was improper because a submissible case was not made on the issue whether Mr. Doe executed a written authorization to disclose his HIV test results to his employer.

Section 191.656 provides that "[a]ll information known to ... any person ... concerning an individual's HIV infection status or the results of any individual's HIV testing shall be strictly confidential and shall not be disclosed except" in specified circumstances set out in the statute. Relevant here is the circumstance set out in section 191.656.2(*l*)(c), which excepts disclosure of test results "pursuant to the *written* authorization of *the subject of the test* ... results" (emphasis added).

Quest agrees that section 191.656.2(1)(c) requires written authorization for disclosure of an individual's test results but it argues that it is not necessary that the authorization must have been actually written or executed by the patient being tested. It contends that it is sufficient to show, as it did here, that the patient delivered the paper that contained the number notation written by another and which Quest interpreted to be an authorization by that other person. This is incorrect.

■ A basic principle of statutory interpretation is that words and phrases are to be considered in their plain and ordinary meaning. *Brownstein v. Rhomberg–Haglin & Associates, Inc.*, 824 S.W.2d 13, 15 (Mo. banc 1992). Section 191.656.2(*l*)(c) exempts liability for disclosure of test results only "pursuant to the written authorization of the *subject* of the test result." A plain reading of the phrase "written authorization of the subject" indicates that Mr. Doe, as the subject, must provide his authorization, in writing, in order for Quest to disclose his HIV test results. The statute by its terms does not provide an exception from liability where authorization for disclosure is supplied merely by an oral statement or physical delivery of a document on which someone other than the subject has provided written authorization.

■ Here, it is uncontested that it was Dr. German's assistant, Ms. Mustone, and not Mr. Doe, who wrote "Faxed to 3xx-xxx8" on the requisition form. Further, it also is uncontested that the number was not written as part of a specific written authorization, or even in the box labeled "Fax to," but rather was placed in a box indicating physicians or payors. There is no evidence that Mr. Doe made *any* mark on the requisition form, nor is there evidence that Mr. Doe signed any other forms authorizing the disclosure of his results. The fact that sloppy filling out of the form by persons other than the subject was commonplace on forms submitted to Quest, according to one Quest employee, does not turn the writing of a number in an inappropriate place by an unauthorized person on the form into a written authorization of the subject of the test, as required by statute.[4] There was

---

3. Jury Instruction No. 9 read: "Your verdict must be for defendant on Plaintiff's claims submitted in Instruction No. 8, if you believe that defendant faxed the plaintiff's HIV lab results to 3xx-xxx8, pursuant to plaintiff's written authorization."

4. Because the authorization was not put in writing by the subject in any form, this Court

no evidence to support the submission of the affirmative defense contained in Instruction No. 9 that Mr. Doe provided written authorization for Quest to fax his HIV test results to 3xx-xxx8.

> The basic principle applicable to the submission of instructions is that they should not be given if there is no evidence to support them. Instructions must be supported by substantial evidence and reasonable inferences to be drawn therefrom. Instructions which are at variance with the charge or which are broader in scope than the evidence are improper unless it is shown that an accused is not prejudiced thereby."

*State v. Daugherty*, 631 S.W.2d 637, 639–40 (Mo. banc 1982) (citations omitted) (overruled on other grounds by *State v. Baker*, 636 S.W.2d 902, 904 (Mo. banc 1982)).

 Instruction No. 9 directed the jury to consider a nonexistent written authorization, and was, therefore, improper. Because the instruction was improper, the burden shifts to Quest to show that Mr. Doe was not prejudiced as a result. An error is prejudicial, requiring a new trial, if it materially affects the merits of the action by misdirecting, misleading or confusing the jury. *First Bank*, 364 S.W.3d at 219; *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010).

Rather than arguing that directing the jury to nonexistent evidence of an affirmative defense was not prejudicial, Quest argues that it should have been granted a directed verdict on Mr. Doe's section 191.656 claim because Mr. Doe did not offer expert testimony to establish the ap-

plicable standard of care for reporting test results by a diagnostic testing laboratory. Quest also argued that "negligence" should have been defined as breaching this specialized professional standard of care. Quest argues this makes any prejudice caused by the erroneous instruction irrelevant.

As discussed at greater length in Section IV below, this Court rejects the argument that expert testimony as to the standard of care was necessary in order to prove a violation of section 191.656. Liability for violation of the statute does not depend on one's status as a medical provider or otherwise; it depends on whether one violated the statute's explicit confidentiality requirement that disclosure not be made except with the written authorization of the subject. Negligence in violating this statutory requirement, not some independent professional standard of care, is the basis of the action.

Quest offers no other reason why the misdirection of the jury was not so prejudicial as to require a new trial in and of itself. Furthermore, in this case counsel exacerbated the prejudice by emphasizing to the jury in closing argument that the number on the form could be considered a written authorization. The jury's resulting confusion, as well as its focus on the affirmative defense, is evident from the note the jury sent to the judge during deliberations asking "Does the decision on the [the affirmative defense], hinge on our decision on [the verdict director], about whether the plaintiff has given written authorization?" Submission of Instruction No. 9 was reversible error.

---

need not reach the issue of how explicit the writing by "the subject of the test" must be in order to constitute a written authorization under section 191.656.2(c). Even were the

writing by the subject of a fax number in the appropriate box sufficient to constitute "written authorization," that is not what occurred here.

### C. Submission of Jury Instruction Number 6 is Error but Not Prejudicial

Mr. Doe also sought to submit Quest's disclosure of his HIV test results as a breach of a common law fiduciary duty. The trial court permitted Mr. Doe to do so, but it required Mr. Doe to prove that the breach was caused by Quest's negligence in order to recover. Mr. Doe argues that it was error to require proof of negligence, as proof of negligence is not required in order to prove a breach of other fiduciary relationships recognized by Missouri courts.

Mr. Doe is correct that a breach of fiduciary duty is based on a breach of a relationship of trust and confidence of the parties,[5] rather than on a traditional tort theory. Further, negligence has not been a required element of proof of breach of any of the types of relationships previously recognized as fiduciary by Missouri courts. *See e.g., Klemme v. Best,* 941 S.W.2d 493, 495 (Mo. banc 1997) (to show breach of fiduciary duty owed to client by attorney, client must prove: an attorney-client relationship; breach of a fiduciary obligation by the attorney; proximate causation; damages to the client; no other recognized tort encompasses the facts alleged); *Robert T. McLean Irrevocable Trust v. Patrick Davis, P.C.,* 283 S.W.3d 786, 792–93 (Mo.App.2009) (Generally, "an adequately pleaded claim for breach of fiduciary duty consists of the following elements: the existence of a fiduciary relationship between the parties; a breach of that fiduciary duty; causation; and harm."); *Shervin v. Huntleigh Sec. Corp.,* 85 S.W.3d 737, 740 (Mo.App.2002) ("When breach of fiduciary duty is asserted ... the proponent must establish that a fiduciary duty existed between it and the defending party, that the defending party breached the duty, and

that the breach caused the proponent to suffer harm.")

Here, however, Mr. Doe's argument begs the question whether a fiduciary relationship has been recognized by this Court in the first instance. If not, then any error in requiring proof of negligence in order to show a breach of that fiduciary duty could not have been prejudicial, for Mr. Doe would not have been entitled to submit the theory at all.

Mr. Doe acknowledges that no Missouri case has previously recognized a fiduciary relationship between an independent laboratory that tests blood and a patient of a doctor who has submitted the blood. He also cites to no case in the country that has recognized a fiduciary relationship between a diagnostic testing laboratory and a patient in these or similar circumstances. He nonetheless asks this Court to recognize such a relationship in this case as an issue of first impression.

This Court need not reach the issue whether it would recognize a fiduciary relationship between laboratory and patient if there were no existing cause of action for breach of confidentiality and a special relationship of trust and confidence had been shown of the kind that has been the basis for other fiduciary relationships. Here, section 191.656 clearly imposes a duty of confidentiality and permits suits for its breach. But, it does so only where negligence or intentional misconduct are shown. It recognizes a duty of confidentiality that is breached by negligence, not a fiduciary duty.

◼ It is well settled that where there is an adequate remedy at law, a court lacks authority to grant equitable relief. *Wal-*

---

**5.** *See e.g., Trieseler v. Helmbacher,* 350 Mo. 807, 168 S.W.2d 1030, 1036 (1943) ("A confidential or fiduciary relation exists where two persons stand in such a relation as that, while

it continues, confidence is necessarily reposed by the one and the influence which naturally grows out of that confidence is possessed by the other.").

ton v. City of Berkeley, 223 S.W.3d 126, 128 (Mo. banc 2007) ("The trial court lacked equitable [authority] since Walton did not plead or present any evidence that there was not an adequate remedy at law for the cause of action") (citation omitted); *Thorn & Hunkins Lime & Cement Co. v. Citizens' Bank*, 158 Mo. 272, 59 S.W. 109, 110 (1900). This is because courts also are hesitant to create a new remedy when there is already an established remedy available or if existing doctrine can be revised to protect an inadequately protected interest. *See Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546, 554 (Mo.App.1983) (noting that where there is a traditional tort remedy available, a *prima facie* tort cause of action should not be fashioned). Because section 191.656 provides an adequate remedy at law for breach of confidentiality, this Court will not create an additional equitable remedy by recognizing a separate fiduciary duty of confidentiality. As Mr. Doe was not entitled to submit a fiduciary duty theory in the first instance, any error in requiring proof of negligence in order to recover under that theory could not have been prejudicial.

## III. DIRECTED VERDICT

In his final point on appeal, Mr. Doe argues that the trial court erred in granting Quest Diagnostics' motion for a directed verdict on both the wrongful disclosure and breach of fiduciary duty claims.

### A. Standard of Review

■ The standard of review for the trial court's grant of Quest Diagnostics' motion for directed verdict is whether Mr. Doe made a submissible case. "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Investors Title Co., Inc. v. Hammonds*, 217 S.W.3d 288, 299 (Mo. banc 2007).

### B. Trial Court Did Not Err in Granting Motion for Directed Verdict

■ Mr. Doe argues that Quest Diagnostics was directly involved in the disclosure of his HIV test results because Mary Petty, the phlebotomist who ordered Mr. Doe's test results to be faxed to his employer, worked in a facility owned by Quest Diagnostics, was trained by Quest Diagnostics staff and wrote the fax number on a Quest Diagnostics form. Ms. Petty, however, was an employee of Quest Diagnostic's subsidiary, Quest Laboratories. Moreover, although the computer generated requisition form and the test reports did contain the Quest Diagnostics logo, the forms themselves are not alleged to be the cause of the injury. Liability under section 191.656 is for the *act* of wrongful disclosure. Nothing in the evidence showed that Quest Diagnostics' form authorized the release of Mr. Doe's HIV results or that it had trained Ms. Petty to release test results without written authorization. To the contrary, there was no evidence as to where Ms. Petty was trained. The evidence did show that she was employed by Quest Laboratories not Quest Diagnostics and that she based her decision to release the information not on the form but on her experience with how doctors sometimes set out faxing information in disregard of the boxes on the Quest form. It is this act of disclosure that is at issue, not whose form the request was written on, who trained Ms. Petty or who owned the building that she worked in. Mr. Doe did not make a submissible case on his theory of direct liability against Quest Diagnostics.

■ Mr. Doe alternatively argues that this Court should pierce the corporate veil and hold Quest Diagnostics responsible for any torts committed by its subsidiary, Quest Laboratories. Mr. Doe acknowl-

edges that generally a parent company is not responsible for the acts of its subsidiary corporation and that this Court has admonished that parent/subsidiary separation should be "ignored with caution, and only when the circumstances clearly justify it." *Cent. Cooling & Supply Co. v. Dir. of Revenue, State of Mo.*, 648 S.W.2d 546, 548 (Mo. banc 1982). For this reason, as this Court noted in *66, Inc. v. Crestwood Commons Redevelopment Corp.*, 998 S.W.2d 32 (Mo. banc 1999), corporate forms will be ignored and the corporate veil pierced only if three factors are shown:

1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

2) Such control must have been used by the corporation to commit fraud *or* wrong, to perpetrate the violation of statutory or *other positive legal duty,* or dishonest and *unjust* act in contravention of plaintiff's legal rights; and

3) The control and breach of duty must proximately cause the injury or unjust loss complained of. *Id.* at 40.

Mr. Doe's attempt to hold Quest Diagnostics liable for the torts of its subsidiary fails at the first step. He rested with introducing Quest Diagnostic's abstract 2007 Annual Report explaining that it owned a laboratory in St. Louis, showing that Ms. Petty used Quest Diagnostics forms and was supervised by employees of Quest Diagnostics, and showing that Quest Diagnostics admitted it was responsible for protecting the privacy of its patients.

But, these are not the criteria for piercing the corporate veil. No evidence offered provided the trial court or this Court with evidence illuminating the corporate structure and ownership of Quest Laboratories; regarding what percentage of Quest Laboratories is owned by Quest Diagnostics; regarding any overlap in their boards of directors or corporate officers; regarding the financial relationship between Quest Diagnostics and Quest Laboratories; or regarding who pays the salaries of Quest Laboratories employees. Evidence was not offered to show that the directors and officers of Quest Laboratories failed to act independently in the interest of Quest Laboratories but instead took their orders from Quest Diagnostics and acted in the latter's interest.

The facts shown by Mr. Doe are insufficient to show that Quest Diagnostics exerted such "complete domination" over Quest Laboratories that the latter had "no separate mind, will or existence of its own." The trial court did not err in granting Quest Diagnostic's motion for directed verdict.

## IV.　AFFIDAVIT OF MERIT

■　Quest Laboratories also argues that Mr. Doe's claims should have been dismissed prior to trial because he failed to file an affidavit of merit as required by section 538.225, RSMo. Section 538.225 states, in relevant part:

In any action *against a health care provider* for damages for personal injury or death *on account of the rendering of or failure to render health care services,* the plaintiff or the plaintiff's attorney shall file an affidavit with the court stating that he or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contrib-

uted to cause the damages claimed in the petition.

(emphasis added). Quest argues that the laboratory that tested Mr. Doe's blood was a health care provider providing health care services to Mr. Doe as a patient, and therefore, an affidavit was required.[6]

As this Court stated in *Mahoney v. Doerhoff Surgical Services, Inc.,* 807 S.W.2d 503, 507 (Mo. banc 1991), the purpose of section 538.225 "is to cull at an early stage of litigation suits for negligence damages against health care providers that lack even color of merit, and so to protect the public and litigants from the cost of ungrounded *medical malpractice claims.*" (emphasis added). Mr. Doe's claims against Quest are for breach of confidentiality. This is not a medical malpractice action.

While Quest happens to be a laboratory, under section 191.656 *anyone* can be liable for disclosing HIV information and records without regard to whether they are a medical provider, and the standard of proof for a cause of action under section 191.656 is the same regardless of whether a doctor, nurse or other government or private person reveals HIV records. Indeed, Quest did not claim, nor could it have, that Mr. Doe had to prove a breach of the laboratory's duty of care as a medical provider in order to recover, for such proof is not required by section 191.656 and, as discussed in detail earlier, Quest has emphatically denied any other duty to Mr. Doe. Yet, the affidavit of merit required by section 538.225 is addressed to just such a duty: a plaintiff must obtain the written opinion of a health care provider stating that the defendant "failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances." The action here is based on Quest's duty to conform to the requirements of section 191.656, not on what a reasonable medical provider would have done in the same or similar circumstances (although one may presume that a reasonable provider would comply with statutory requirements). Therefore, it cannot be said that the duty of confidentiality for medical records is a "health care service" under section 538.225. Mr. Doe was not required to provide a medical affidavit.

## V. CONCLUSION

The trial court erred in submitting Instruction No. 9, an affirmative defense not supported by the evidence, in that there was no evidence that Mr. Doe provided written authorization for the disclosure of his HIV test results. The trial court also erred in submitting Mr. Doe's claim of breach of fiduciary duty. The judgment as to Quest Laboratories is reversed and the case is remanded. The judgment as to Quest Diagnostics is affirmed.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and DRAPER, JJ., concur.

WILSON, J., not participating.

---

6. Although Mr. Doe argues that this issue is not properly before this Court because Quest did not preserve it for appeal or raise it in this Court by filing a cross-appeal, it will likely arise on remand and will, therefore, be briefly addressed here.