

# MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| **DEBORAH BARKLEY,** | ) | |
| | ) | **WD75944** |
| **Appellant,** | ) | |
| | ) | **OPINION FILED:** |
| v. | ) | |
| | ) | **April 15, 2014** |
| **MCKEEVER ENTERPRISES, INC.** | ) | |
| **D/B/A PRICE CHOPPER,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**Honorable James F. Kanatzar, Judge**

**Before Division One: Alok Ahuja, P.J.,**
**Thomas H. Newton, and Anthony R. Gabbert, JJ.**

**Summary**

Ms. Deborah Barkley appeals the judgment entered in favor of McKeever Enterprises, Inc. d/b/a Price Chopper after a jury trial. We affirm.

**Factual and Procedural Background**

In May 2009, Ms. Barkley was shopping for items for a family barbecue at Price Chopper with her husband, Mr. James Barkley, and three granddaughters. Ms. Barkley and a granddaughter went to shop for strips to match her glucose meter. As she searched for them, Ms. Barkley grabbed other items, including notebooks and a tube of children's toothpaste, and placed them into a red reusable bag. She then placed the red bag on the shoulder shared with her purse and used her free hand to carry a bag with several reusable bags inside of it. Shortly thereafter,

1

they reconnected with Mr. Barkley and the other grandchildren and walked to the register. As Mr. Barkley placed items from the cart on the conveyor belt, Ms. Barkley walked around the register. She then handed the sacker the reusable bags, but the red one remained on her shoulder with the purse. After paying for the groceries, they proceeded to the exit.

Store security officers, Mr. Jason Herrington and Mr. Cody Millard, had been observing Ms. Barkley on the store's surveillance videos. They stopped her in the vestibule area. Ms. Barkley's red bag and purse were taken from her, and Mr. Herrington escorted her to the security office. Mr. Millard told Mr. Barkley that Ms. Barkley had been detained for shoplifting. Mr. Barkley reentered the store with his purchased groceries and granddaughters and sat in front of the customer service area. The security office was in close proximity to the customer service area.

Ms. Barkley, Mr. Millard, and Mr. Herrington entered the security office, along with Ms. Derica Davidson, a customer service employee who accompanied them per Price Chopper's policy for female suspects. On one side of the office was a counter with monitors that extended along the wall; the other side had a door, a file cabinet next to it, a bench, and another file cabinet adjacent to another door. Mr. Herrington pointed to the bench and told Ms. Barkley to sit down, and Ms. Barkley complied. Mr. Herrington emptied the red bag and then her purse on the counter and inspected most of the items in the purse. Mr. Herrington placed her items back into the purse, except for her medications and driver's license.

At some point, Ms. Barkley left her seat and walked over to where Mr. Herrington was speaking to Ms. Davidson; their backs were to her. Mr. Millard told Ms. Barkley to return to the bench; she continued to approach, and he did not try to stop her. Mr. Herrington and Ms. Davidson did not hear Mr. Millard's statement and continued to talk.

2

Upon realizing Ms. Barkley was behind him, Mr. Herrington immediately grabbed Ms. Barkley's arm to handcuff her. Ms. Barkley verbally and physically resisted. Mr. Herrington then twisted her into a file cabinet, as he pulled her arms behind her back, and placed on one handcuff. Ms. Barkley allegedly complained of "pain or some sort of discomfort," so he released the handcuff, moved her arms to the front, and handcuffed her. He secured the lock, pointed to the bench, and told Ms. Barkley to sit down. Ms. Barkley refused, and Mr. Herrington reached out to guide her to the bench. Ms. Barkley immediately stepped back and went for the door.

Ms. Barkley was able to open the door slightly. Mr. Herrington grabbed her from behind, using some of his strength to pull her hands off the doorknob. Mr. Millard ran over to help him. Mr. Herrington then took his foot and contacted Ms. Barkley's legs, which brought her legs out from underneath her and she fell on the floor. Ms. Davidson just watched and closed the door. After struggling with her, Mr. Herrington penned Ms. Barkley to the floor as the handcuffs were moved to the back. Although Mr. Millard was ready to assist, Mr. Herrington single-handedly yanked Ms. Barkley up. Ms. Barkley's legs did not reach the standing position; Mr. Herrington released her into an awkward sitting position on the floor.

After Mr. Millard and Mr. Herrington completed their tasks, about ten minutes later, Mr. Herrington removed the handcuffs from the back to the front. Thereafter, both men lifted her off of the floor and walked a limping Ms. Barkley to the bench. A police officer entered the office about eight minutes later. Ms. Barkley eventually was escorted out.

Subsequently, Ms. Barkley filed a multi-count petition for damages against Price Chopper. Under the false imprisonment claim, she alleged that Price Chopper through the store's employees, had "intentionally restrained" her against "her will," during which she was "verbally and physically injured . . . unlawfully searched, . . . [and] was caused to suffer great

3

pain and anxiety." Under the battery claim, she alleged that Price Chopper had "intentionally pushed, pulled, restrained, handcuffed, struck, kicked, grabbed, and tackled [her], and thereafter forced her to remain sitting on her knees on the floor in an abnormal position." In addition to pain and suffering damages, Ms. Barkley sought punitive damages on the ground that Price Chopper's conduct was "outrageous and in conscious disregard for [her] rights and interests."

In October 2012, a jury trial was had. During the trial, the above facts were adduced through the store's surveillance video clips. Because there was no audio for the clips, Ms. Barkley and the employees testified as to what was said and done while in the security office. Mr. Barkley and one of the store's owners, Mr. Gary McKeever, testified to other matters. Portions of a deposition statement from Ms. Tracey Hugunin, the head of store security, were read to the jury. Additionally, portions from the deposition of Dr. Marjon Gillbanks, M.D., Ms. Barkley's former doctor, were read into evidence, some over Ms. Barkley's timely objection. At the close of Price Chopper's case, Ms. Barkley offered evaluations of Mr. Herrington reporting his similar behavior with other customers, dated before and after the incident, as rebuttal evidence in support of her punitive damages claim. The trial court excluded the evidence. It also excluded a lawsuit against Price Chopper based on similar conduct by different security officers.

Only the battery and false imprisonment claims were submitted to the jury. At the jury instructions conference, Ms. Barkley objected to Price Chopper's proffered battery instruction providing an affirmative defense against the battery claim and to the affirmative defense instruction. Ms. Barkley argued that the affirmative defense instruction was improper because the law did not support it, and thus, the battery instruction was improper for referencing it. The court approved the defense and submitted Instructions 9 and 10 to the jury.

4

The jury returned verdicts favorable to Price Chopper on both counts. Ms. Barkley filed a motion for a new trial, which the trial court denied. The trial court then entered a judgment reflecting the verdicts. Ms. Barkley appeals, challenging certain jury instructions and the admission and exclusion of certain evidence.

## Standard of Review

Our review in determining whether a jury was properly instructed is *de novo*. *Doe v. Quest Diagnostics, Inc.*, 395 S.W.3d 8, 13 (Mo. banc 2013). Instructions are rejected or submitted based on the law and the evidence in the case. Rule 70.02(a). We view the evidence and inferences in the light most favorable to the submission of an instruction. *McGuire v. Kenoma*, *LLC,* 375 S.W.3d 157, 164 (Mo. App. W.D. 2012). An erroneous instruction only results in a reversal for a new trial when it is prejudicial. *Doe*, 395 S.W.3d at 13. Prejudicial means that "the error materially affects the merits by misdirecting, misleading, or confusing the jury." *Id.*

We review the admission or the exclusion of evidence for an abuse of discretion. *See McGuire*, 375 S.W.3d at 164. "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* (internal quotation marks and citation omitted).

## Legal Analysis

In her first point, Ms. Barkley argues that the trial court erred in rejecting her proposed verdict director for the battery claim, which did not reference an affirmative defense, and instead submitting Price Chopper's Instruction 9, a verdict director that did reference an affirmative defense, and submitting Instruction 10, the affirmative defense, itself. Ms. Barkley claims that

5

Rule 70.02 was violated because her proposed verdict director "was applicable to [her] battery claim and thus was required to be given to the exclusion of any other instructions on the same subject" and because the submitted Instructions 9 and 10 asked the jury to find for Price Chopper "if it believed that [Price Chopper] used reasonable force to prevent [Ms. Barkley] from fleeing the Loss Prevention Office and such facts do not constitute a defense to battery under the applicable law." She further claims that the submission of the instructions "thereby misstated the applicable law, misdirected the jury and misled the jury resulting in prejudicial error."

Ms. Barkley argues that there is no defense to batteries committed against a suspected shoplifter after the property is recovered and after a merchant's investigation has concluded. We disagree.

In arguing that a merchant's privilege to detain a suspected shoplifter is limited to the recovery of the property and the investigation of the theft, Ms. Barkley relies on *Teel v. May Department Stores Co.*, 155 S.W.2d 74, 78 (Mo. 1941), and subsections 2 and 3 of section 537.125. Section 537.125,[1] in relevant part, states:

> 2. Any merchant, his agent or employee, who has reasonable grounds or probable cause to believe that a person has committed or is committing a wrongful taking of merchandise or money from a mercantile establishment, may detain such person in a reasonable manner and for a reasonable length of time *for the purpose of investigating whether there has been a wrongful taking of such merchandise or money.* Any such reasonable detention shall not constitute an unlawful arrest or detention, nor shall it render the merchant, his agent or employee, criminally or civilly liable to the person so detained.
>
> 3. Any person willfully concealing unpurchased merchandise of any mercantile establishment, either on the premises or outside the premises of such establishment, shall be presumed[2] to have so concealed such merchandise with the intention of committing a wrongful taking of such merchandise within the

---

[1] Statutory references are to RSMo 2000.

[2] This provision is a rebuttable presumption. *See Schwane v. Kroger Co.*, 480 S.W.2d 113, 118-19 (Mo. App. 1972).

6

meaning of subsection 1, and the finding of such unpurchased merchandise concealed upon the person or among the belongings of such person shall be evidence of reasonable grounds and probable cause for the detention in a reasonable manner and for a reasonable length of time, of such person by a merchant, his agent or employee, *in order that recovery of such merchandise may be effected*, and any such reasonable detention shall not be deemed to be unlawful, nor render such merchant, his agent or employee criminally or civilly liable.

(emphasis and footnote added).

Enacted in 1961, section 537.125 is deemed the codification of the merchant's privilege announced in *Teel*, with certain limitations. *See Helming v. Adams*, 509 S.W.2d 159, 166 (Mo. App. 1974). In *Teel*, our supreme court decided that a merchant's continued detention of the plaintiff was improper because the merchant's employee compelled the detention until the plaintiff and her companion signed criminal confessions that he had written. 155 S.W.2d at 79. The supreme court specifically hypothesized that had the employee compelled the detention to hold the plaintiff for authorities, it would have been lawful, if done without unreasonable delay. *Id.* at 79-80. The *Teel* court cited secondary sources, which referenced the common law right of a private citizen to make a warrantless arrest of a person[3] who in fact committed a crime, with no liability for false imprisonment, if soon thereafter the citizen attempts to deliver that person to the authorities. *Id.* at 79. The merchant's privilege is a modification of that right; in cases in which an arrest of a person who was not guilty in fact is made, a merchant is exempt from liability if the merchant had probable cause to make the arrest. *See Caverton v. J.C. Penny Co.*, 651 S.W.2d 608, 610 (Mo. App. E.D. 1983) (explaining the merchant's privilege in section 537.125 in relation to the common law right of citizen warrantless arrest); *Helming*, 509 S.W.2d at 166. Thus, *Teel* does not support Ms. Barkley's narrow interpretation of the merchant's privilege.

---

[3] This common law right has been codified in the Missouri Revised Statutes at section 563.051.

Clearly, the merchant's privilege includes detaining an individual for a reasonable amount of time to release him or her to the authorities after a complete investigation. Other jurisdictions with statutes similar to ours have found that the privilege includes a right to detain for the police after recovery of the items and an investigation. *See Jacques v. Sears, Roebuck & Co.*, 285 N.E.2d 871, 874, 876 (N.Y. 1972); *Cooke v. J. J. Newberry & Co.*, 232 A.2d 425, 427-28 (N.J. Super. App. Div. 1967). We believe a fair reading of section 537.125 shows the legislature's intent to codify this purpose in subsection 4:

> Any merchant, his agent or employee, who has reasonable grounds or probable cause to believe that a person has committed a wrongful taking of property, as defined in this section, and who has detained such person and investigated such wrongful taking, may contact law enforcement officers and instigate criminal proceedings against such person. Any such contact of law enforcement authorities or instigation of a judicial proceeding shall not constitute malicious prosecution, *nor shall it render the merchant, his agent or employee criminally or civilly liable to the person so detained or against whom proceedings are instigated.*

(emphasis added).

To read subsection 4 as to provide protection against a claim for malicious prosecution for instigating a criminal proceeding or contacting law enforcement only after the release of a suspect would not give effect to the italicized language, and we must give effect to all of the statutory language. *See Herschel v. Nixon*, 332 S.W.3d 129, 134 (Mo. App. W.D. 2010). Thus, under section 537.125, a merchant with probable cause to believe a person has wrongfully taken property may detain a suspect (1) to reasonably recover property without unreasonable delay, (2) to reasonably investigate the matter without unreasonable delay, or (3) to release the person to the authorities without unreasonable delay.

The issue now becomes a question of what physical force, if any, by a merchant is allowable in a continued detention. *Teel* and other Missouri case law addressing the merchant's privilege are silent as to whether force is permissible in these circumstances. Section 537.125

8

arguably addresses the issue with the broad language: "may detain . . . in a reasonable manner." *See Caverton*, 651 S.W.2d at 610 (suggesting that the use of unreasonable force used to effect a detention became an element for a false imprisonment claim with the enactment of section 537.125); *Peak v. W. T. Grant Co.*, 386 S.W.2d 685, 692-93 (Mo. App. 1964) (suggesting section 537.125 would have been available to the merchant as an affirmative defense to plaintiff's action for false arrest and imprisonment for forcible detention resulting in injuries to plaintiff had the merchant suspected plaintiff of a wrongful taking). The statute, however, does not provide a guide as to what type of force would constitute detention in a "reasonable manner." We thus look to other law on the subject matter to construe under what circumstances the use of physical force is lawful during a continued detention.

Similar to the Missouri statute, other jurisdictions, such as Arizona, provide in their merchant privilege statutes that any detention of a suspected shoplifter must be done in a "reasonable manner."[4] Arizona has adopted Comment (h) to section 120A of the Restatement (Second) of Torts in determining what force used by a merchant constitutes detention in a "reasonable manner." *Gortarez v. Smitty's Super Valu, Inc.*, 680 P.2d 807, 814-15 (Ariz. 1984). Comment (h) states:

> Reasonable force may be used to detain the [suspect]; but . . . the use of force intended or likely to cause serious bodily harm is never privileged for the sole purpose of detention to investigate, and it becomes privileged only where the resistance of the other makes it necessary for the actor to use such force in self-defense. In the ordinary case, the use of any force at all will not be privileged until the other has been requested to remain; and it is only where there is not time for such a request, or it would obviously be futile, that force is justified.

*Id.* We adopt this comment in its entirety and protect a merchant's use of reasonable force to continue the detention of a suspect, after a request has been made for the suspect to remain

---

[4]*See also Dillard Dep't Stores, Inc. v. Silva*, 148 S.W.3d 370, 372 (Tex. 2004) (finding the unwarranted commission of a battery during the detention made the detention unreasonable).

unless time does not permit a request or such request would be futile. "[T]he privilege is meaningless if reasonable force cannot be used. It makes no sense to assume that shoplifters caught in the act will simply comply with a request to wait for the police to arrive." *Commonwealth v. Rogers*, 945 N.E.2d 295, 306 (Mass. 2011).

Consequently, Price Chopper, as a merchant, was allowed to use physical force in the continued detention of Ms. Barkley, and thus had an available affirmative defense against a battery claim. Ms. Barkley's first point is denied.[5]

In the second point, Ms. Barkley argues that the trial court erred in submitting Instruction 10 because the evidence did not support the submission. Ms. Barkley claims that competent and substantial evidence did not support its submission because it "hypothesized that all of the batteries inflicted upon [her] were [done so] after and as a result of her alleged attempt to flee the loss prevention office when in fact the evidence showed that numerous batteries were inflicted upon her before the alleged attempt to flee."

At trial, Ms. Barkley objected to Instruction 10 because "it submit[ted] inapplicable and inappropriate defenses to [her] battery claim. It misstate[d] the law with respect to [her] battery claim and the law with respect to defenses to battery." She further objected to the Instruction "because it [wa]s not supported by the evidence and [misled] the jury as to the law and the

---

[5] Although the dissent apparently does not disagree with our construction of the scope of the privilege afforded by section 537.125.2, the dissent argues that Instruction 10 was improperly modified and prejudicial because it failed to identify the alleged theft as the "unlawful act" in paragraph First. According to the dissent, the theft is the only justification for the use of force under the merchant's privilege pursuant to section 537.125.2. This is directly contrary to our conclusion that a merchant also is privileged to use physical force in a continued detention. It was the use of force for that purpose that was in question here, making it illogical to posit in Paragraph First Ms. Barkley's "alleged theft" and not her refusal to sit down and attempt to flee the office though instructed to remain. More to the point, Ms. Barkley does not raise the issue raised by the dissent in her points on appeal or arguments. Rather, Ms. Barkley's appellate argument is that there was no affirmative defense to the alleged batteries committed against her, not that the wording of Instruction 10 was improper in the manner described by the dissent.

10

evidence." She specifically stated that the facts of the case did not support a submission of MAI 32.10.

"Where an alleged error on appeal relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal." *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 823 (Mo. banc 2000). Because Ms. Barkley raises a different challenge to Instruction 10, she did not preserve this claim of error. We have discretion to exercise plain error review of instructional error. *Sasnett v. Jons*, 400 S.W.3d 429, 437 (Mo. App. W.D. 2013) (internal quotation marks and citation omitted). We decline plain error review. Ms. Barkley's second point is denied.

Ms. Barkley's third and fourth points challenge the admission and the exclusion of evidence, respectively. The trial court has broad discretion in admitting or excluding evidence. *Westerman v. Shogren*, 392 S.W.3d 465, 472 (Mo. App. W.D. 2012). Erroneous admission of evidence is reversible error only when it results in prejudice that affects the trial outcome. *Peterson v. Progressive Contractors, Inc.*, 399 S.W.3d 850, 869 (Mo. App. W.D. 2013).

Specifically, in her third point, Ms. Barkley argues that the trial court erred in admitting, over her timely objection, evidence that her former doctor wrote release letters to excuse her from jury duty at her request because it was legally irrelevant. She claimed that any "probative value . . . was outweighed by its prejudic[ial effect] of alienat[ing] and foster[ing] resentment by the Jurors who were serving" and that the evidence did result in prejudicing her "right to a fair and impartial Jury." She also argued that it was improper character evidence.

At trial, Ms. Barkley objected before the deposition statements were read to the jury, stating that the evidence was "not probative to any issue" but was "highly prejudicial." The trial court ruled that the evidence was admissible because it believed that it could not "stop" Price

11

Chopper from presenting evidence to "buttress" the damages issue, despite Ms. Barkley's previous testimony of her preexisting physical limitations. But it ordered Price Chopper not to use it to argue Ms. Barkley's veracity (that she made up the condition to get out of jury service).

Price Chopper's attorney read testimony from Dr. Gillbanks, Ms. Barkley's once long-standing doctor, that Ms. Barkley called her office in February 2007 "to get out of jury duty." The attorney read the following physical limitations that the doctor wrote in the release letter: "She is on disability because of musculoskeletal problems, [and] she is unable to sit comfortably for any length of time." The attorney continued to read the letter, highlighting that the doctor wrote that "[Ms. Barkley] spent a lot of time in bed and in a recliner, and sitting on a jury would not be conducive to her good health." The doctor confirmed that the letter expressed her opinion at the time. The attorney then asked the doctor about another time she wrote a release letter from jury duty in 2011. The doctor again confirmed that the letter expressed her opinion of her condition, agreeing with the attorney that Ms. Barkley's condition in 2011 was similar to that in 2007—she could not sit for long periods without experiencing pain. During its closing argument, Price Chopper alluded to Ms. Barkley's failure to perform her jury duty when its attorney thanked the jurors for "honor[ing] [their duty] and . . . [not] try[ing] to get out of it." Ms. Barkley failed to object.

Ms. Barkley claims that the letters she obtained from her doctor to secure an excuse from jury duty twice were not logically relevant because cumulative evidence had already been admitted showing the nature and extent of her injuries in addition to her medical history, and parts of the same doctor's testimony confirmed her testimony. Price Chopper claims that the evidence was probative in that it "documented the seriousness of [Ms.] Barkley's preexisting condition." It further argues that the jury duty excuse letters "provided context for how [Ms.]

12

Barkley's preexisting condition affected her physical abilities prior to the incident so that the jury could weigh an appropriate damage award for personal injuries if liability for battery was determined in [her] favor."

In personal injury claims, evidence of a plaintiff's health and physical condition proving or disproving the nature and extent of the alleged injuries received is admissible. *Eickmann v. St. Louis Pub. Serv., Co.*, 323 S.W.2d 802, 806 (Mo. 1959). However, any parts of the various medical items can be excluded for irrelevancy. *Allen v. St. Louis Pub. Serv. Co.*, 285 S.W.2d 663, 667 (Mo. 1956). The same limitation applies to live testimony about these medical records. *Id.* at 683 (stating that a written medical opinion in a record should receive same regard as an opinion from the witness stand).

Accordingly, Price Chopper had the right to present evidence on the damages issue. We cannot say that the evidence's prejudicial effect outweighed its probative value as a matter of law. Although the excuse letters may have placed Ms. Barkley in a negative light, especially with Price Chopper's clever use of the evidence in thanking the jurors for their service, we cannot conclude that the trial court abused its discretion in admitting the evidence. Ms. Barkley's third point is denied.

As to her fourth point, Ms. Barkley argues that the trial court erred in excluding evidence of reprimands as to Mr. Herrington's similar conduct before and after the incident and the court file "containing evidence of a separate claim against [Price Chopper]" because the evidence was competent, material, and relevant as to the issue of punitive damages. We do not need to address this issue. Our denial of points one and two essentially affirmed the jury's verdict denying compensatory damages thereby this issue is mooted. *See Blue v. Harrah's N. Kansas City, LLC*, 170 S.W.3d 466, 474 (Mo. App. W.D. 2005) (stating punitive damages are available only if

13

actual or nominal damages are awarded).  Accordingly, Ms. Barkley's fourth and final point is denied as moot.

## Conclusion

Therefore, we affirm the judgment.

/s/THOMAS H. NEWTON
Thomas H. Newton, Judge


Thomas H. Newton, Judge, writes for the majority.  Alok Ahuja Presiding Judge, concurs.

Anthony R. Gabbert, Judge, writes a dissent.



In the

Missouri Court of Appeals

Western District

| | |
|---|---|
| DEBORAH BARKLEY,<br><br>    **Appellant,**<br><br>v.<br><br>McKEEVER ENTERPRISES, INC.<br> d/b/a PRICE CHOPPER,<br><br>    **Respondent.** | **WD75944**<br><br>**FILED: April 15, 2014** |

## DISSENTING OPINION

I respectfully dissent. I would find that the circuit court erred in submitting Instructions Number 9 and Number 10 to the jury. Price Chopper pled in its Answer to Plaintiffs' Amended Petition under "Affirmative Defenses" that Price Chopper was entitled to the "mercantile privilege defense" pursuant to Section 537.125.2, RSMo 2000. However, Instruction 10, which set forth this defense to the jury, does not follow Section 537.125.2 and, as written, would have misdirected, misled and confused any reasonable juror.

As set forth in the majority's opinion, Section 537.125.2 allows for any merchant who has reasonable grounds or probable cause to believe that a person has

1

committed or is committing a wrongful taking of merchandise or money from a mercantile establishment to detain such person in a reasonable manner and for a reasonable length of time for the purpose of investigating the perceived wrongful taking. The statute provides that "[a]ny such reasonable detention shall not constitute an unlawful arrest or detention, nor shall it render the merchant, his agent or employee, criminally or civilly liable to the person so detained." As Section 537.125.2 does not mention the use of physical force, any defense to use of force must be viewed through the lens of whether the force used constituted a reasonable detention for the purpose of investigating the perceived theft. Therefore, without conceding that MAI 32.10 is even appropriate on the facts of this case, even if MAI 32.10 could be modified pursuant to Rule 70[1] for use with the merchant's defense as set forth in Section 537.125, the unlawful act that must be described in the instruction pursuant to Section 537.125.2 is the act of a wrongful taking. The template for MAI 32.10, titled "Battery Actions-Resisting Invasion of Property," is as follows:

> Your verdict must be for defendant if you believe:
>
> First, plaintiff attempted to (*here describe unlawful act such as "enter defendant's home" or "take defendant's property"*) when plaintiff had no right to do so, and
>
> Second, defendant (*here describe defensive measures such as "struck plaintiff"*) for the purpose of resisting plaintiff's attempt, and
>
> Third, defendant used only such force as was reasonable and necessary to prevent plaintiff from (*here repeat act described in Paragraph First*).

---

[1]"Rule 70 contemplates the frequent situations in which no MAI is applicable and provides for modification of an existing MAI or drafting of a "not-in-MAI" instruction." *Peel v. Credit Acceptance*, 2013 WL 2301095 *5 (Mo. App. 2013). "The test of a modified MAI or not-in-MAI instruction is whether it follows the substantive law and can be readily understood by the jury." *Id.* The giving of an instruction in violation of Rule 70.02 "shall constitute error, its prejudicial effect to be judicially determined, provided that objection has been timely made pursuant to Rule 70.03." Rule 70.02(c).

2

Here, the "unlawful act[s]" described to the jury through the modified MAI 32.10 in Instruction 10 were that "Barkley either refused to follow the Defendant's Loss Prevention Officers' instructions or attempted to flee the Loss [P]revention Office." The alleged theft, which would have been the only justification for the mercantile privilege defense pursuant to Section 537.125.2, is not mentioned in the instruction. This is error. While Section 537.125.2 may have allowed Price Chopper, without liability, to reasonably detain Barkley in a reasonable manner to investigate the possible theft, Section 537.125.2 does not provide for detention of a customer because they refuse to follow merchant instructions or attempt to leave a store. This is prejudicial error because it alters the standard by which the jury considers reasonableness and reasonableness is a principal element of the Section 537.125.2 mercantile privilege defense.

As Instruction Number 10 is written, an average juror would not properly understand that Price Chopper's reasonableness must be based on its actions in detaining Barkley for a wrongful taking, not in detaining Barkley for refusals or attempted flight. Logically, more force may be necessary to detain someone from the crime of fleeing, if it were a crime, than to detain someone for investigation of a theft. Consequently, a jury could conceivably conclude that the force used to keep an individual from fleeing was reasonable, but that same force was unreasonable in the context of investigating a theft. Clearly, detention refusal and/or flight are proper considerations for the jury when addressing the overall reasonableness of the detention for theft pursuant to Section 537.125.2. However, by improperly designating Barkley's crime as refusing to follow instructions and attempting to flee,

3

instead of theft, Instruction Number 10 does not follow the substantive law of Section 537.125.2 and prejudicially alters the jury's focus.

The majority creates a new test that future juries must now decipher before making a reasonableness determination – whether or not there was a request to remain, whether or not there was time for such a request, whether such a request would have been futile. Our present law and Section 537.125.2 already sufficiently encompass these specific reasonableness inquiries by leaving to the fact finder's determination, upon proper instruction, whether the method and manner of detention was reasonable in light of the circumstances. The majority acknowledges that Section 537.125.2 already addresses whether force is permissible with use of the broad language: "may detain . . . in a reasonable manner." Yet, the majority goes on to provide a guide as to what constitutes "reasonable" force. I find it unnecessary to define allowable force in mercantile detentions because, prior to considering the mercantile privilege defense to battery, the jury must first find that an intended, offensive bodily contact occurred. Clearly, if the jury has determined that an intended, offensive bodily contact occurred, force can be presumed. It is then for the jury to decide whether the offensive bodily contact resulted from the merchant's reasonable detention of the offended party for a theft investigation pursuant to Section 537.125.

The issue here is whether the court erred in giving Instruction Number 10 in conjunction with Instruction Number 9 because the instructions failed to follow substantive law and misled the jury. Because Instruction Number 10 does not follow substantive law with regard to Price Chopper's Section 537.125.2 mercantile

4

privilege defense, it was error to submit it to the jury.  Because Instruction Number 10 misleads and confuses a reasonable juror into considering reasonableness under an improper lens, the error is prejudicial and I would reverse.


/s/ ANTHONY REX GABBERT
Anthony Rex Gabbert, Judge

5