

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

DANNY PETIFURD, )
                )
          Respondent, )
v. )    WD87416
                )
                )    OPINION FILED:
MISSOURI DEPARTMENT OF )    May 27, 2025
CORRECTIONS, )
                )
          Appellant. )

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable J. Dale Youngs, Judge**

**Before Division One:** Karen King Mitchell, Presiding Judge, and
Lisa White Hardwick and Mark D. Pfeiffer, Judges

The Missouri Department of Corrections (DOC) appeals the judgment entered on a jury verdict in favor of former employee Danny Petifurd on his claim of retaliation under the Missouri Human Rights Act (MHRA). DOC raises two points on appeal. First, DOC alleges the trial court erred in denying its motion for judgment notwithstanding the verdict (JNOV) because Petifurd failed to present substantial evidence of a causal connection between his MHRA-protected activity and his termination. Second, DOC asserts the trial court erred by applying a 1.5 multiplier to calculate attorneys' fees awarded to Petifurd in that the court considered the contingent nature of the case when

determining the lodestar amount[1] and again when evaluating whether to apply a multiplier to that amount. Finding no error, we affirm.

## Background[2]

In 2013, Petifurd went to work for DOC in Cameron, Missouri. Approximately two years later, he transferred to DOC's Western Reception Diagnostic Correctional Center (WRDCC) in St. Joseph, Missouri. After about a year, he transferred back to Cameron, where he spent roughly a year before transferring to WRDCC again. On December 13, 2016, Petifurd was promoted to Physical Plant Supervisor I at the Kansas City Reentry Center (KCRC), a position he held until his termination on October 25, 2019.

While working at WRDCC, Petifurd was instructed by his supervisors to monitor B.H., a fellow employee, and write her up for various policy violations every day. Petifurd was later told that B.H., who is gay, had rejected a sexual advance by a male supervisor, who was using Petifurd to punish B.H. for her rejection. In February 2017, Petifurd filed a complaint alleging that he was ordered to retaliate against B.H. B.H. later filed a lawsuit against DOC, and, in July 2018, Petifurd was deposed in that case. Petifurd reported that he did not "roll" on his supervisors in the B.H. deposition.

---

[1] "The lodestar amount is determined by multiplying the number of hours reasonably expended by a reasonable hourly rate in the community." *Berry v. Volkswagen Grp. of Am.*, 397 S.W.3d 425, 429 n.3 (Mo. banc 2013) (quoting *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 530 n.6 (Mo. App. E.D. 2009)).

[2] "We view the evidence in the light most favorable to the verdict, disregarding evidence to the contrary." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 44 n.1 (Mo. App. W.D. 2016) (quoting *Turner v. Kansas City Pub. Schs.*, 488 S.W.3d 719, 722 (Mo. App. W.D. 2016)).

In August 2018, Petifurd again reported to DOC that his supervisors had ordered him to discriminate against B.H. In February 2019, an investigator with DOC's Office of Professional Standards (OPS) (Investigator 1) interviewed Petifurd in connection with this August 2018 report. During that interview, which was recorded, Petifurd said he did not "come clean" during the B.H. deposition in that he did not disclose that his supervisors had instructed him to write B.H. up for no reason at all and deny her requests for promotion. In March 2019, Petifurd's complaint that his supervisors were using him to discriminate against B.H. was assigned to another OPS investigator (Investigator 2) who also listened to Petifurd's recorded interview with Investigator 1. Neither of the Investigators made note of Petifurd's admission that he had not been truthful in the B.H. deposition.

Months later, Petifurd filed an internal complaint alleging that a Deputy Warden at KCRC (Deputy Warden) was both discriminating against Petifurd (on the basis of gender) and retaliating against him.[3] On October 1, 2019, another OPS Investigator (Investigator 3), who was assigned to review Petifurd's complaint about Deputy Warden, interviewed Petifurd. During that interview, Petifurd said he "lied for the State of Missouri" in the B.H. deposition because he is "a company person." Petifurd also reported that he was about to be deposed in a lawsuit alleging discrimination, harassment, and retaliation by Deputy Warden against L.R., another employee, and that Petifurd was afraid he would lose his job if he told the truth in the L.R. deposition. Investigator 3

---

[3] Petifurd first met Deputy Warden at KCRC.

believed Petifurd's concern about losing his job if he told the truth was sincere. However, Investigator 3's report, dated October 2, 2019, of her interview with Petifurd the previous day did not mention his admission that he lied in the B.H. deposition or his concerns about the upcoming L.R. deposition.[4]

The L.R. deposition took place on October 10, 2019. There, Petifurd testified that Deputy Warden had discriminated against L.R. because she is a woman.[5] Fifteen days later, Petifurd was terminated by the Director of DOC's Division of Adult Institutions (Director) via letter delivered to Petifurd by the Warden at KCRC (Warden). Neither the letter nor the Warden provided an explanation for the termination. After Petifurd was fired, he went to KCRC one day to pick up his wife who still worked there; Petifurd ran into Deputy Warden in the parking lot, and Deputy Warden expressed surprise that Petifurd was fired over the L.R. deposition.[6]

---

[4] Investigator 2 participated in Investigator 3's interview with Petifurd and later generated a "supplemental report" dated October 24, 2019, documenting, for the first time, Petifurd's admission that he lied in the B.H. deposition. That supplemental report states, "During the course of the [October 1] interview, Petifurd stated that he had to 'lie' to keep his job because if a person tells the truth against the [DOC], you will not be around long and you will be fired."

[5] During the L.R. deposition, Petifurd was asked whether he had had a prior conversation about his testimony in a different case not being accurate; he replied, "No."

[6] Transcripts of the B.H. deposition and the L.R. deposition are not part of the legal record in this case. DOC, "as appellant, has the duty to provide a complete record on appeal for the determination of questions presented to the appellate court." *Cottonaro v. Express Med. Transp., Inc.*, 688 S.W.3d 751, 756 n.5 (Mo. App. W.D. 2024) (quoting *Baumgartner v. Bi-State Dev. Agency*, 811 S.W.2d 63, 65 (Mo. App. E.D. 1991)).

On October 21, 2021, Petifurd sued DOC for disability discrimination, gender discrimination, and retaliation in violation of the MHRA.[7] At trial, Warden testified that Petifurd's firing was the first time Warden had notified an employee of termination without knowing the reason(s) for that decision. Warden also testified that Petifurd was not afforded the usual process—notice, opportunity to be heard, and consideration of a lesser sanction—before being terminated.

Director testified that Petifurd was fired based solely on Investigator 2's October 24 supplemental report that Petifurd "admitted that he had been dishonest in a deposition which is a violation of departmental policy."[8] Director did not specifically recall what Petifurd had been dishonest about but it was her understanding that Petifurd had testified falsely about Deputy Warden. Director also stated that Petifurd was fired because he did not provide the context for, or an explanation of, why he lied under oath.[9] Director denied that Petifurd was terminated because of his testimony in the L.R. deposition on October 10.

At the close of Petifurd's evidence, he withdrew his claims for disability discrimination and gender discrimination. DOC moved for a directed verdict on the remaining claims of retaliation and hostile work environment and on the submission of

---

[7] It appears that, at some point, Petifurd filed an amended petition adding a claim of hostile work environment, but the amended petition is not included in the record on appeal.

[8] Another OPS investigator testified at Petifurd's trial that DOC's general counsel had said, on October 10, that Petifurd was going to be fired. That statement was made two weeks before the October 24th supplemental report.

[9] When she terminated Petifurd, Director was aware that Petifurd had made reports of discrimination and retaliation and that he had testified in a deposition involving DOC.

punitive damages to the jury. The court granted DOC's motion with respect to Petifurd's hostile work environment claim but denied the motion as to his retaliation claim and submission of punitive damages. DOC again moved for directed verdict on retaliation and punitive damages at the close of all the evidence, but the court denied that motion.

The jury returned a verdict in favor of Petifurd on his retaliation claim and awarded him $195,000 for back pay; $43,000 for past economic losses (excluding back pay); $462,000 for future economic losses; $600,000 for non-economic losses; and $2,500,000 in punitive damages. The court requested briefing on the application of the statutory caps in § 213.111.4[10] and the award of attorneys' fees and costs under § 213.111.2.

On May 21, 2024, the trial court entered its judgment on the jury verdict. Applying the statutory caps in § 213.111.4, the court reduced the amount of Petifurd's award to $695,000, which represented $195,000 in back pay plus $500,000 for past economic losses (excluding back pay), future economic losses, non-economic losses, and punitive damages. On Petifurd's motion, the court also awarded attorneys' fees under § 213.111.2. In calculating attorneys' fees, the trial court first determined the lodestar amount to be $411,440. The court then applied a multiplier of 1.5 to the lodestar amount, and awarded attorneys' fees in the amount of $617,160.

---

[10] All statutory references are to the Revised Statutes of Missouri (Supp. 2023).

DOC filed its motion for JNOV, which the court denied. This appeal follows. Additional facts will be provided in the analysis, as necessary, to address the points raised on appeal.

**Analysis**

DOC raises two points on appeal. First, DOC alleges the trial court erred in denying its motion for JNOV because Petifurd failed to present substantial evidence of a causal connection between his MHRA-protected activity and his termination. Second, DOC asserts the trial court erred by applying a 1.5 multiplier to the lodestar amount because the court considered the same factor—the contingent nature of the case—when calculating the lodestar and again when determining whether to apply a multiplier. We address each point in turn.

I. **The trial court did not err in denying DOC's motion for JNOV because Petifurd made a submissible case on his claim of retaliation.**

In Point I, DOC contends the trial court erred in denying DOC's motion for JNOV because Petifurd failed to make a submissible case on his retaliation claim. We disagree.

"To withstand a motion for JNOV, [Petifurd] was required to 'make a submissible case by offering substantial evidence to support every fact essential to a finding of liability.'" *Turner v. Kansas City Pub. Schs.*, 488 S.W.3d 719, 722 (Mo. App. W.D. 2016) (quoting *Hurst v. Kansas City, Mo. Sch. Dist.*, 437 S.W.3d 327, 336 (Mo. App. W.D. 2014)). "Whether the plaintiff made a submissible case is a question of law, which we review *de novo*." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 47 (Mo. App. W.D. 2016). "We will reverse the jury's verdict only where we find 'a complete absence

7

of probative facts to support the jury's conclusion.'" *Turner*, 488 S.W.3d at 722 (quoting *Hurst*, 437 S.W.3d at 336).

Under the MHRA, it is unlawful for an employer to "retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing pursuant to this chapter." § 213.070.1(2). "To make a submissible case for retaliation under section 213.070, a plaintiff must establish that: (1) he complained of discrimination;[11] (2) the defendant took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *Shiffman v. Kansas City Royals Baseball Club, LLC*, 687 S.W.3d 443, 467 (Mo. App. W.D. 2024).

In Point I, DOC challenges only the third element of Petifurd's retaliation claim—whether a causal relationship existed between his complaints of discrimination/retaliation and his termination.[12] The requisite causal relationship exists where "the protected criterion was the motivating factor," meaning "the employee's protected classification actually played a role in the adverse action or decision and had a determinative influence

---

[11] "A retaliation claim is not conditioned on the success of the underlying discrimination . . . claim." *Soto*, 502 S.W.3d at 48 (quoting *Minze v. Mo. Dep't of Pub. Safety*, 437 S.W.3d 271, 275-76 (Mo. App. W.D. 2014)). "Thus, it is irrelevant to a claim of retaliation that the act complained of was not legally actionable. The only issue is whether the person making the complaint had a reasonable good faith belief that there were grounds for the claim of discrimination." *Id.* (quoting *Minze*, 437 S.W.3d at 276).

[12] The parties do not dispute that Petifurd complained of discrimination and retaliation within DOC or that DOC's decision to terminate him constituted an adverse employment action against him.

8

on the adverse decision or action." § 213.010(2), (19). DOC argues that the decision to terminate Petifurd was motivated by his disclosure that he lied under oath in the B.H. deposition. Petifurd contends that the motivating factor was his prior complaints about discriminatory and retaliatory practices at DOC and his truthful testimony in the L.R. deposition.

Direct evidence of retaliation may include remarks by the employer demonstrating a discriminatory attitude and comments reflecting a discriminatory animus in the employment decision-making process. *Shiffman*, 687 S.W.3d at 467. Here, there is some direct evidence of retaliatory motive. When asked what Petifurd had lied about, Director, who made the termination decision at issue, testified to her understanding that Petifurd had lied about Deputy Warden during the B.H. deposition. But, according to Petifurd, he was not asked about Deputy Warden during the B.H. deposition; any testimony he gave regarding Deputy Warden would have been in the L.R. deposition, in which he claims he told the truth about Deputy Warden.[13] Also, when Petifurd encountered Deputy Warden in the parking lot after Petifurd had been fired, Deputy Warden expressed his surprise

---

[13] In arguing that Petifurd failed to offer sufficient evidence of a causal connection between his MHRA-protected activity and his termination, DOC claims Petifurd failed to show Director knew about Petifurd's complaints of discrimination. But Director's testimony that Petifurd had lied about Deputy Warden suggests Director was aware of Petifurd's complaints against Deputy Warden. Director also testified that she was aware of Petifurd's reports of discrimination and retaliation and that Petifurd had testified in a deposition involving MHRA claims against DOC. Moreover, the only "evidence" about what Director knew and did not know came from Director herself, and the jury was free to evaluate her credibility on that point in determining what weight to give her testimony.

that Petifurd was fired over the L.R. deposition.[14]  Both of these statements by DOC

employees support Petifurd's argument that he was, in fact, fired for testifying truthfully

in the L.R. deposition about Deputy Warden's discriminatory conduct.

Petifurd also "can rely on circumstantial evidence that tends to support an

inference of retaliatory motive." *Soto*, 502 S.W.3d at 48.  Petifurd offered circumstantial

evidence supporting an inference that his complaints regarding Deputy Warden's

discriminatory conduct were the motivating factor in DOC's decision to terminate him.

By late March 2019, both Investigator 1 and Investigator 2 were aware of Petifurd's

admission that he lied in the B.H. deposition.[15]  The person who was in charge of OPS

during the relevant time period testified, "As soon as the Civil Rights Officer knew

that . . . Petifurd had lied under oath, . . . that is the kind of behavior that would need to

be reported immediately."  Yet, neither Investigator 1 nor Investigator 2 made note of

Petifurd's admission.[16]  From testimony showing that DOC did not act on Petifurd's

---

[14] DOC did not object to the admission of Petifurd's testimony about his conversation with Deputy Warden in the parking lot of KCRC.

[15] Petifurd again reported, during his October 1, 2019 interview with Investigators 1 and 2, that he lied under oath in the B.H. deposition.

[16] Investigator 3 testified that Investigator 2 left the October 1 interview with Petifurd and reported what Petifurd had said to an unnamed supervisor.  But Investigator 3 did not identify the supervisor, and Investigator 2 was not called to testify at trial.  And no evidence was offered that the unnamed supervisor acted on the information provided by Investigator 2 after the October 1 interview.

Investigator 2 did not document Petifurd's admission of October 1 until Investigator 2 prepared his supplemental report dated October 24, 2019.  The jury could infer that, once the decision to terminate Petifurd was made, the supplemental report was drafted to suggest that the reason for the termination was Petifurd's testimony in the B.H. deposition and not the L.R. deposition.  This inference is supported by the fact that Investigator 2 drafted a separate report and delayed finalizing it for nearly three weeks.

10

admission immediately, the jury could infer that his admission was not the real reason for his termination.

Several DOC witnesses testified that there was no investigation into Petifurd's admission to determine exactly what he lied about in the B.H. deposition. Based on testimony that DOC did not bother to determine what Petifurd lied about, a fact finder could reasonably infer that Petifurd's admission was a pretext for his termination. *Soto*, 502 S.W.3d at 50 (quoting *Turner*, 488 S.W.3d at 724) (A "form of circumstantial evidence that is probative of retaliatory motive is [p]roof that the defendant's [proffered] explanation is unworthy of credence.").

Additionally, Warden testified that Petifurd was not afforded the usual process— notice, an opportunity to be heard, and consideration of a lesser sanction—before he was fired. Petifurd was not given notice of his pending termination or an opportunity to explain his testimony in the B.H. deposition. And no consideration was given to a lesser sanction. *McKinney v. City of Kansas City*, 576 S.W.3d 194, 203 (Mo. App. W.D. 2019) (Where the employer "terminate[d] [the plaintiff] without giving a serious thought to a lesser sanction . . . , motivation is clearly suspect.").

Also, Petifurd's termination on October 25 occurred much closer in time to his testimony in the L.R. deposition on October 10 than to his initial disclosure in February 2019 that he lied in the B.H. deposition. The temporal proximity of the L.R. deposition and DOC's decision to fire Petifurd justifies an inference of retaliatory motive. *Soto*, 502 S.W.3d at 49-50 (finding temporal proximity of protected conduct and adverse employment action may be circumstantial evidence of retaliatory motive).

11

Viewing the record in the light most favorable to Petifurd, we conclude that the offered evidence was sufficient to support the jury's finding that a causal relationship existed between his MHRA-protected activity and his termination. This is not a case involving "a complete absence of probative facts to support the jury's conclusion." *Turner*, 488 S.W.3d at 722 (quoting *Hurst*, 437 S.W.3d at 336). Thus, the trial court did not err in denying DOC's motion for JNOV on Petifurd's retaliation claim.

Point I is denied.

## II. The trial court did not abuse its discretion by applying a 1.5 multiplier to the lodestar amount in calculating attorneys' fees.

In Point II, DOC claims the trial court erred by applying a 1.5 multiplier to attorneys' fees awarded to Petifurd because the court considered the contingent nature of the case when determining the lodestar amount and again when evaluating the necessity of applying a multiplier.[17]

"We review the trial court's award of attorney's fees for an abuse of discretion." *Warren-Cook v. Mo. Dep't of Pub. Safety*, 688 S.W.3d 75, 78 (Mo. App. W.D. 2024). "A trial court abuses its discretion when its decision is against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id.* (quoting *Alhalabi v. Mo. Dep't of Corr.*, 662 S.W.3d 180, 194 (Mo. App. W.D. 2023)). "We deem the trial court an expert on fees in a given case due [to] the court's familiarity with all

---

[17] The MHRA authorizes courts to award "reasonable attorney fees" to the prevailing party. § 213.111.2. "A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit." *Alhalabi v. Mo. Dep't of Nat. Res.*, 300 S.W.3d 518, 530 (Mo. App. E.D. 2009). DOC does not dispute that Petifurd is the prevailing party for purposes of this analysis.

issues in the case and the character of the legal services rendered." *Id.* (quoting *Gray v. Mo. Dep't of Corr.*, 635 S.W.3d 99, 105 (Mo. App. W.D. 2021)). "We presume an award of attorney's fees to be correct, and the complaining party has the burden to prove otherwise." *Id.* (quoting *Gray*, 635 S.W.3d at 105). "We should not reverse an attorneys' fee award unless 'the amount awarded is arrived at arbitrarily or is so unreasonable that it indicates indifference and a lack of proper judicial consideration.'" *Kelley v. Mo. Dep't of Corr.*, 679 S.W.3d 69, 87 (Mo. App. E.D. 2023) (quoting *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 853 (Mo. App. E.D. 2021)).

"While the trial court has discretion to award reasonable attorneys' fees, there are factors that may be considered to determine the amount of attorneys' fees to award." *Berry v. Volkswagen Grp. of Am.*, 397 S.W.3d 425, 431 (Mo. banc 2013). Relevant factors include:

> 1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; 2) the number of hours reasonably expended on the litigation; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition.

*Id.* (quoting *Hill v. City of St. Louis*, 371 S.W.3d 66, 81-82 (Mo. App. E.D. 2012)).

Here, the trial court considered the following factors in calculating the lodestar amount:

> the range of rates customarily charged by attorneys with comparable experience in the Kansas City Metropolitan Area, especially as the Court considers the "nature and character of the services rendered," which takes into account the fact that plaintiff's counsel took this engagement on a contingent fee basis—thereby justifying a somewhat higher hourly rate than might otherwise be deemed reasonable.

The trial court also considered the "importance of the subject matter" of the lawsuit and the "vigor of the opposition," among the other factors. Applying these factors, the court calculated the lodestar amount to be $411,440. DOC does not take issue with the court's calculation of the lodestar amount. Instead, DOC challenges the court's application of a 1.5 multiplier to the lodestar amount.

In *Berry*, the trial court considered the enumerated factors in setting the lodestar amount then "premised its use of the multiplier on a list of [other] enumerated factors, some of which [we]re duplicative of the factors utilized in its calculation of the lodestar amount." *Berry*, 397 S.W.3d at 432. On appeal, the *Berry* court stated that, in determining whether to apply a multiplier, the trial court "should avoid awarding a multiplier based upon facts that [the court] considered in its initial determination of the lodestar amount." *Id.* The court then upheld the multiplier even though some factors were duplicative because "at least three of the seven factors directly support[ed] the application of a multiplier and demonstrate[d] there was no abuse of discretion." *Id.*; *Terpstra v. State*, 565 S.W.3d 229, 252 (Mo. App. W.D. 2019) (affirming a 1.5 multiplier even though "the trial court also considered the contingent nature of the case in its determination of the lodestar" because "the trial court's consideration of other factors support[ed] application of the multiplier and demonstrate[d] that the trial court did not abuse its discretion").

The three non-duplicative factors identified in *Berry* are: (1) that counsel's fees were always contingent on the outcome of the case; (2) that taking the case precluded counsel from taking other less risky cases; and (3) that counsel's work on other cases was

14

delayed because of the demand of preparing the instant case for trial (the *Berry* factors). *Id.* at 432-33. Based on those factors, the *Berry* court affirmed the use of a 2.0 multiplier "to ensure a market fee that compensated . . . counsel for taking th[e] case in lieu of working less risky cases on an hourly basis." *Id.* at 433. "[T]he [*Berry*] factors[, however, a]re not held to be strict requirements or elements requiring the absence of any one element to preclude the application of a multiplier." *Kelley*, 679 S.W.3d at 88. "Rather, . . . we believe that each case should be decided on a case-by-case basis, with due regard given to the three aforementioned factors." *Id.*

In applying a 1.5 multiplier to the lodestar amount in this case, the trial court noted "the undisputed fact that [Petifurd's] attorneys have always represented him on a contingent fee basis." The court then reasoned,

> in light of similar submissions of trial counsel deemed by the court of appeals in *Kelley* and *Warren-Cook* to be sufficient proof regarding factors two and three—[the court] finds that [Petifurd] has met his burden to show the facts and circumstances that overcome the presumption that the lodestar amount alone is the appropriate award.

Accordingly, the court applied the 1.5 multiplier to the lodestar amount and awarded attorneys' fees in the amount of $617,160 ($411,440 x 1.5).

In *Kelley*, the trial court relied on the following factors in applying a 1.5 multiplier: "Kelley's attorneys had demonstrated that their fee was always contingent, and . . . taking th[e] case precluded them from accepting other employment that would have been less risky, and that the time required by the demands of preparing this case for trial delayed work on their other cases." *Kelley*, 679 S.W.3d at 80-81 (internal quotations omitted). On appeal, DOC argued that the trial court erred in applying the multiplier

because Kelley's application for fees did not support a factual finding that taking Kelley's case precluded her attorneys from accepting other, less risky employment. *Id.* at 87. The court upheld application of the multiplier, finding "there was certainly evidence before the court consistent with two of the three factors set forth in *Berry*," but the court did not elaborate further regarding the nature of the evidence. *Id.* at 89.

In *Warren-Cook*, DOC challenged the application of a 1.5 multiplier, arguing that the second *Berry* factor—that taking the case precluded counsel from taking other, less risky cases—lacked the necessary factual basis. *Warren-Cook*, 688 S.W.3d at 80. Citing *Kelley* and its holding that all three *Berry* factors are not mandatory for a multiplier to be applied, the *Warren-Cook* court dispensed with the appellants' point on appeal because DOC conceded that two of the three *Berry* factors were satisfied. *Id.* at 81.

Nevertheless, in view of the *Kelley* court's admonition that "each case should be decided on a case-by-case basis, with due regard given to the three [*Berry*] factors," *Kelley*, 679 S.W.3d at 88, the *Warren-Cook* court addressed the merits of each *Berry* factor and concluded that there was a factual basis for each. *Warren-Cook*, 688 S.W.3d at 81. Based on time records and affidavits, the court concluded that trial counsel spent hundreds of hours over more than five years litigating Warren-Cook's case, all on a contingent fee basis (the first *Berry* factor). *Id.* The evidence also revealed that counsel was precluded from accepting other, less risky work by representing Warren-Cook (the second *Berry* factor). *Id.* In discussing the second *Berry* factor, the court noted the "inherent riskiness of Warren-Cook's case due to the contingent fee nature of her attorney's representation. By accepting representation on this basis, '[Warren-Cook's]

16

counsel thereby assumed the risk of receiving no compensation for the time invested or reimbursement for expenses advanced if [Warren-Cook's] claim did not succeed.'" *Id.* at 81-82 (quoting *Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 250 (Mo. banc 2013)). Lastly, citing statements in affidavits of counsel, the court concluded that counsel delayed work on other cases due to the demands placed on counsel by Warren-Cook's case (the third *Berry* factor). *Id.* at 81.

In the present case, DOC does not dispute that the first *Berry* factor—that counsel's fees were always contingent on the outcome of the case—is satisfied. DOC's argument on appeal is that the trial court considered the contingent nature of counsel's fees in calculating the lodestar amount *and* in determining whether to apply a multiplier. And, in doing so, the court violated "the only clear rule adopted in *Berry* with respect to applying a multiplier [which] is that a trial court should 'avoid awarding a multiplier based upon facts that it considered in its initial determination of the lodestar amount.'" *Id.* at 80 (quoting *Kelley*, 679 S.W.3d at 88). But, as both the *Kelley* and *Warren-Cook* courts concluded, all three of the *Berry* factors are not required to be present in order to apply a multiplier. And, here, there was ample evidence of the second and third *Berry* factors which are not duplicative of any factor the trial court considered in setting the lodestar amount.

The affidavit and time record evidence provided to the trial court in this case is very similar to the evidence the *Warren-Cook* court found sufficient to support the second and third *Berry* factors. In his affidavit, Petifurd's lead trial counsel testified that working on Petifurd's case "took away from [counsel's] ability to work on or accept

17

other employment that would have been less risky [the second *Berry* factor]. Moreover, the time required by the demands of preparing [Petifurd's] case for trial delayed [counsel's] other work [the third *Berry* factor]." Lead counsel also testified that he "had to refer to other lawyers potential cases that were referred to [him] because [he] was preparing the trial of [Petifurd's] case." Trial co-counsel testified as follows:

> While I prepared for [Petifurd's] trial and during trial, I was not able to advance other cases including, but not limited to, taking depositions, conducting mediations, and attending to discovery and other litigation matters. My other clients' cases were put on hold while I devoted nearly all my working hours to the preparation and trial of . . . Petifurd's case.

> My engagement in the trial of . . . Petifurd's case prevented me from being trial counsel in another matter that was set to begin the same week.

> While preparing this case for trial, I was precluded from accepting other employment that would have been less risky.

Other counsel for whom Petifurd seeks attorneys' fees testified, "The time required by the demands of preparing this case for trial delayed work on my other cases. While I prepared for this trial and during trial, I was not able to advance other cases, including, but not limited to, taking depositions and talking with potential witnesses." Counsel testified, "The time I spent on working . . . Petifurd's case is time I could have spent on [domestic law] cases that pay hourly." Another counsel testified, "[t]he time I spent on working . . . Petifurd's case is time I could have spent on less risky cases that paid hourly or per project." Hourly-paying work and fee-based projects are "clearly less risky than [Petifurd's] contingent fee basis litigation, in that the hourly-paid work could be billed

18

and collected at regular intervals by counsel, regardless of the outcome" of the representation.[18]  *Warren-Cook*, 688 S.W.3d at 82.

Consistent with *Berry*, *Kelley*, and *Warren-Cook*, even if the trial court did duplicate its consideration of the contingent nature of the representation, we decline to find that the court abused its discretion in applying a 1.5 multiplier to the lodestar amount where other non-duplicative factors supported use of the multiplier.

Point II is denied.

### III.        Motion for attorneys' fees on appeal

On May 5, 2025, Petifurd filed a motion for attorneys' fees on appeal; that motion has been taken with this case.  The MHRA's authorization of "reasonable attorney fees" includes a prevailing party's appellate attorney's fees.  § 213.111.2; *see Hays v. Dep't of Corr.*, 690 S.W.3d 523, 529 (Mo. App. E.D. 2024).  Petifurd briefed and argued the issues raised by DOC's appeal, and we are affirming the trial court's judgment on grounds Petifurd raised.  Accordingly, Petifurd is the prevailing party in this appeal; thus, we grant Petifurd's motion for attorneys' fees on appeal.  *See Wiseman v. Mo. Dep't of Corr.*, WD 86412, 2025 WL 898740, at *6 (Mo. App. W.D. Mar. 25, 2025) (awarding attorneys' fees to the prevailing party when dismissing appeal for lack of jurisdiction);

---

[18] In the argument portion of its brief, DOC contends Petifurd's counsel did not provide details as to the second and third *Berry* factors, but that is not the basis for DOC's Point II which is only that the trial court twice considered the contingent nature of the case.  Issues raised in the argument portion of a plaintiff's brief but not addressed in a point relied on are not preserved for appellate review.  *Faatz v. Ashcroft*, 685 S.W.3d 388, 401 (Mo. banc 2024).

*Hays*, 690 S.W.3d at 529 (dismissing appeal for lack of jurisdiction and awarding prevailing-party attorneys' fees).

Although we have authority to award attorneys' fees on appeal, we "exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested." *Hays*, 690 S.W.3d at 529 (quoting *Soto*, 502 S.W.3d at 58). Therefore, we remand the matter to the trial court to determine and award Petifurd reasonable attorneys' fees arising from this appeal.

## Conclusion

The trial court did not err in denying DOC's motion for JNOV because Petifurd made a submissible case on his retaliation claim. And the trial court did not abuse its discretion by applying a 1.5 multiplier to the lodestar amount for attorneys' fees. The court's judgment is affirmed. We remand the case to the trial court to determine and award Petifurd reasonable attorneys' fees for this appeal.

_____
Karen King Mitchell, Presiding Judge

Lisa White Hardwick and Mark D. Pfeiffer, Judges, concur.

20